# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2172

_____

United States of America,　　　*

　　　　　*

　　　　Appellee,　　　*

　　　　　*　　Appeal from the United States

v.　　　　*　　District Court for the

　　　　　*　　District of North Dakota.

Billy Dean Brown,　　　*

　　　　　*

　　　　Appellant.　　　*


_____

Submitted:  December 11, 2001
Filed:  April 15, 2002

_____

Before WOLLMAN,[1] Chief Judge, HANSEN, Circuit Judge, and FENNER, District Judge.[2]

_____

HANSEN, Circuit Judge.

A federal grand jury indicted Billy Dean Brown, an enrolled member of the Spirit Lake Tribe, with three counts of assault resulting in substantial bodily injury

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002.  He has been succeeded by the author of this opinion.

[2]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, sitting by designation.

to a child under 16 and one count of assault resulting in serious bodily injury. See 18 U.S.C. §§ 113(a)(6) & (7), 1153 (1994). The events surrounding the charges occurred on the Spirit Lake Reservation in North Dakota and arose out of injuries suffered by J.J.B., the 20-month-old child of Brown's live-in girlfriend. The jury convicted Brown on all four counts, and the district court[3] departed upward 3 levels and sentenced Brown to 63 months of imprisonment. Brown challenges both his convictions and sentence, arguing that the indictment contained multiplicitous charges, his trial counsel was ineffective, and the district court abused its discretion in departing upward. We affirm.

I.

J.J.B. was airlifted to the Children's Hospital and Clinic in St. Paul, Minnesota, at 3:30 a.m. on February 16, 2000, for surgery to repair a perforated bowel. Tennille Baker, Brown's girlfriend, initially brought the child to a local clinic on February 14 with a fever, diarrhea and vomiting, and a stiff and bloated abdomen. When J.J.B. arrived at Children's Hospital, medical personnel examined him thoroughly and discovered numerous signs of physical injury apart from his abdominal condition. Those injuries included: first and second degree burns on his face and scalp which extended to his inner ear; a lacerated chin; dark bruising on his left ear; a human bite mark on his left thigh; injuries to his toes; and bruising throughout his lower back. Subsequent x-rays also disclosed a left occipital skull fracture of unknown age. A surgeon immediately repaired J.J.B.'s perforated bowel but estimated at that time that he faced a fifty percent risk of mortality. J.J.B. remained on a respirator for two weeks following the surgery but recovered and was released after approximately five weeks in the hospital.

---

[3]The Honorable Rodney S. Webb, Chief Judge, United States District Court for the District of North Dakota.

Hospital personnel found J.J.B.'s injuries to be highly suspicious and reported them to investigators. FBI agents leading the investigation learned that J.J.B. had been well until February 10, 2000, the day that Ms. Baker left J.J.B. alone in Brown's care for the day. When Ms. Baker returned at the end of the day, she found that J.J.B. had suffered burns to his face and a laceration to his chin. Brown claimed that J.J.B.'s older brother burned J.J.B. in the bathtub (although there were no burns to the rest of J.J.B.'s body) and that J.J.B. hit his jaw, causing the cut on his chin. Ms. Baker took J.J.B. to the hospital that night where doctors placed stitches in his chin and treated the burns to his face. J.J.B.'s stomach problems developed later in the week, and he ultimately became lethargic and had difficulty breathing.

Ms. Baker also revealed to investigators that J.J.B. had suffered injuries on August, 26, 1999, when she left J.J.B. alone in Brown's care. When she returned, Brown was trying to comfort the crying child. Ms. Baker noticed a large bump on the back of J.J.B.'s head and arranged for an ambulance to take him to the local clinic. The doctor ordered an x-ray which revealed a skull fracture. The doctor also noted an abrasion on the left side of J.J.B.'s forehead and three nickel-sized red spots on his skull. Ms. Baker was interviewed in 1999 by Bureau of Indian Affairs investigators about the injuries, but no charges were filed at that time.

Throughout the FBI's investigation, the agents found Brown's explanations as to how J.J.B. was injured to be inconsistent and untruthful, or otherwise unpersuasive. The investigation culminated in a grand jury indictment, charging Brown with three counts of assault resulting in substantial bodily injury to a child under 16. See 18 U.S.C. § 113(a)(7). These charges alleged that Brown fractured J.J.B.'s skull on August 26, 1999, burned his face on February 10, 2000, and bit him sometime during February 2000. The indictment also charged one count of assault involving serious bodily injury, see id. § 113(a)(6), alleging that Brown caused J.J.B.'s perforated bowel sometime during February 2000.

Brown testified during trial and admitted that he bit J.J.B. during what he described as innocent play on February 13, 2000, but denied causing J.J.B.'s other injuries. The government presented evidence implicating Brown and explaining the extent of J.J.B.'s injuries. The surgeon who performed J.J.B.'s surgery testified that J.J.B.'s bowel was cut nearly in half by an extremely forceful blow to the child's stomach. The medical evidence further established that J.J.B.'s other injuries were caused by separate and independent traumas.

The jury found Brown guilty of all four counts at the conclusion of the four-day trial. The presentence investigation report (PSR) recommended a Guidelines sentencing range of 46 to 57 months, based on an offense level of 23 and Brown's criminal history category of I. The government sought a 6-level upward departure on the basis that the combined offense level did not adequately account for the three convictions of assault resulting in substantial bodily injury to J.J.B. The district court agreed but concluded that a 3-level upward departure was sufficient under the circumstances. The court sentenced Brown to 63 months of imprisonment, the bottom end of the enhanced range.

## II.

Brown raises numerous claims that his trial counsel was ineffective, including one that his trial counsel failed to inform him of his rights under the Speedy Trial Act, 18 U.S.C. §§ 3161-74 (1994), and the consequences of waiving those rights. The alleged deficiencies of Brown's trial counsel, however, do not fall within the category of ineffectiveness claims that may be raised on direct review. We will consider such claims "only in those exceptional cases in which the district court has developed a record on the ineffectiveness issue or where the result would otherwise be a plain miscarriage of justice." See United States v. Santana, 150 F.3d 860, 863 (8th Cir. 1998). Neither exception is applicable here, thus Brown's ineffectiveness of counsel claims must await a proceeding pursuant to 28 U.S.C. § 2255.

Brown's counsel argued before us that Brown had raised a separate and stand-alone speedy trial violation that may be properly reached on direct review. If so, the issue was not apparent to the Government or to us from Brown's brief. In any event, we conclude that Brown waived his right to appeal the speedy trial issue when he failed to seek a dismissal of the indictment prior to trial. See 18 U.S.C. § 3162(a)(2); United States v. McFarland, 116 F.3d 316, 318 (8th Cir.), cert. denied, 522 U.S. 961 (1997). Brown also argues for the first time on appeal that the indictment was multiplicitous. We decline to reach this argument because Brown similarly failed to challenge the indictment on the ground that it was multiplicitous at any time before the district court. See United States v. Waller, 218 F.3d 856, 857 (8th Cir. 2000); United States v. Shephard, 4 F.3d 647, 650 (8th Cir. 1993), cert. denied, 510 U.S. 1203 (1994).

The most substantial question presented by Brown is whether the district court abused its discretion in departing upward. See United States v. Hampton, 260 F.3d 832, 836 (8th Cir. 2001) (recognizing that a district court's decision to depart upward is reviewed for an abuse of discretion). Although Brown was convicted of multiple crimes, the Sentencing Guidelines expressly preclude the grouping of assault crimes when determining the combined offense level. See U.S. Sentencing Guidelines Manual § 3D1.2 (Nov. 2000). As a consequence, the combined offense level determination for assault crimes proceeds directly under guideline § 3D1.4. Under § 3D1.4 as applied to the assault crimes here, the combined offense level is determined by taking the offense level for the most serious crime of assault and increasing that level by the amount of levels listed in a table provided in § 3D1.4. The extent of the increase in the offense level depends on the number and seriousness of the less severe assault crimes and may range anywhere from 0 to 5 additional levels.

The district court concluded that Brown's conviction for assault resulting in serious bodily injury carried the highest offense level. Because J.J.B. suffered

permanent or life-threatening bodily injury, the aggravated assault guideline required an offense level of 21, see USSG § 2A2.2(a), (b)(3)(C), and the district court imposed a 2-level upward adjustment because J.J.B. was a vulnerable victim, see USSG § 3A1.1(b)(1), resulting in a total offense level of 23. Brown's remaining three convictions for assault resulting in substantial bodily injury to an individual under 16 each yielded an offense level of 10 under the minor assault guideline. See USSG § 2A2.3(a)(1), (b)(1) (imposing an offense level of 10 where the assault involved physical contact and resulted in substantial bodily injury to an individual under 16). Because the offense levels for Brown's additional assault counts each fell more than 9 levels below the offense level for the highest offense, guideline § 3D1.4(c) required the district court to disregard the 3 less-severe crimes of assault in determining the combined offense level. In other words, Brown's convictions arising out of J.J.B.'s fractured skull, the burns to his face, and the bite to his leg had no impact on the severity of the total punishment required under the Guidelines.

Relying on § 3D1.4's background commentary, the district court expressed that it would depart upward 3 levels because the Guidelines failed to provide any additional punishment for the less severe assaults. Brown argues that the district court abused its discretion in departing to compensate for counts that the Guidelines exclude from the sentencing computation. We conclude, however, that the district court was permitted to depart for the precise reasons it enunciated.

The background commentary to guideline § 3D1.4 explains that counts (or groups of counts where the grouping rules apply) with offense levels falling 9 or more levels below the count with the highest offense level are to be disregarded because otherwise, the application of § 3D1.4 could operate to impose excessive punishment. The Sentencing Commission recognized, though, that § 3D1.4's sentencing approach could operate to impose an inadequate sentence, but explained that the sentencing court normally should sentence a defendant toward the upper end of the applicable range to compensate for such an anomalous situation. USSG § 3D1.4, comment.

(backg'd). In those unusual cases where the sentencing range is too restrictive to compensate for the nature of the disregarded count or counts, however, the Commission expressly authorizes the district court to impose an upward departure. See id.

The district court found that Brown's case fell within that unusual category because Brown received no additional punishment despite having caused J.J.B. pain and anguish in three additional instances of abuse. The district court explained:

> In my mind this conduct of the defendant was shocking. The punishment suggested by the guideline for the perforated bowel or the conduct which caused that injury is certainly substantial. But that little boy suffered a fractured skull. That little boy suffered a severe cut on his chin. That little boy suffered burning around his head and ear area. That little boy had a human bite mark on his leg. And this Court can't disregard that kind of conduct, nor did the jury disregard that conduct.

(Sent. Tr. at 9-11).

We could not agree more with the sentiment of the district court. The operation of guideline § 3D1.4 entirely withdrew from the combined offense level computation three separate counts of assault to a defenseless toddler. Making the exclusions all the more disconcerting, the evidence at trial showed that those assaults occurred on three separate days and involved three separate and traumatic injuries, including a skull fracture, to a very small child. Under these circumstances, we agree that Brown's sentence as impacted by the operation of § 3D1.4 involves one of those unusual instances where the sentencing range becomes too restrictive to compensate for the disregarded counts. We therefore hold that the departure was warranted to insure "appropriate additional punishment," USSG § 3D1.4, comment. (backg'd), and that the district court did not abuse its discretion in sentencing Brown beyond the upper end of the initial sentencing range. See Koon v. United States, 518 U.S. 81, 96 (1996) (stating that where a departure factor is encouraged, the sentencing court may

7

depart where the Guidelines do not already take the factor into account). We also note that Brown's sentence exceeded the original sentencing range by only 6 months. Considering the number, severity, and circumstances surrounding the unaccounted for crimes, the extent of the departure was both reasonable and just.

## III.

For these reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.