# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3871

_____

United States of America,         *
                                   *

         Appellee,         *

                                   *   Appeal from the United States

    v.                           *   District Court for the

                                   *   Northern District of Iowa.

                                   *

Dustin Lee Honken,         *

                                   *

         Appellant.        *

_____

Submitted: March 13, 2008
Filed: September 12, 2008

_____

Before RILEY, GRUENDER, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

In 1993, after being indicted on federal drug trafficking charges, Dustin Lee Honken (Honken) and his girlfriend, Angela Johnson (Johnson), kidnaped and murdered a federal witness, the witness's girlfriend, and the girlfriend's two young daughters. Honken and Johnson murdered another potential federal witness three months later.

In 2004, a jury convicted Honken on all 17 counts of a superseding indictment: five counts of witness tampering,[1] one count of soliciting the murder of a witness,[2] one count of conspiracy to tamper with witnesses and to solicit the murder of witnesses,[3] five counts of conspiracy to commit murder while engaging in the manufacture and distribution of methamphetamine (drug conspiracy murder),[4] and five counts of Continuing Criminal Enterprise (CCE) murder.[5] The jury voted to impose the death penalty for the children's murders and life imprisonment for the adults' murders. The district court[6] imposed a sentence of death for the children's murders, life imprisonment for the adults' murders, and terms of imprisonment for the remaining counts. Honken raises eleven issues on appeal. We affirm the thorough and well-reasoned judgment of the district court.

## I.   BACKGROUND

### A.   1993 Drug Charges Against Honken

Honken and his best friend, Timothy Cutkomp (Cutkomp), began manufacturing methamphetamine in Arizona in 1992. Honken distributed his methamphetamine to only two dealers, Greg Nicholson (Nicholson) and Terry DeGeus (DeGeus). Both Nicholson and DeGeus were located in the Mason City,

---

[1]One count in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C), 1513(a)(1)(A) and (B) and 1111; four counts in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A) and 1111.

[2]In violation of 18 U.S.C. § 373(a)(1).

[3]In violation of 18 U.S.C. § 371.

[4]In violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

[5]Also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

[6]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

Iowa, area. Honken became acquainted with DeGeus's then-girlfriend, Johnson, in 1993, and the two promptly began a romantic relationship. Johnson became pregnant with Honken's child later that year.

In March 1993, law enforcement began investigating Nicholson. After officers searched Nicholson's house, Nicholson decided to cooperate in the investigation. On March 21, 1993, officers arranged a recorded meeting between Nicholson and Honken at Nicholson's home in Iowa, during which the two discussed methamphetamine and Nicholson paid Honken $3,000 for past deliveries. That same day, officers arrested Honken and Cutkomp.

Honken moved from Arizona to Mason City after his arrest. Honken was initially charged with state drug offenses. After Nicholson testified before a federal grand jury in April 1993, the grand jury indicted Honken for conspiracy to manufacture methamphetamine, and the state charges were dismissed in favor of federal charges. Honken notified the court he intended to plead guilty, and a plea hearing was scheduled for July 30, 1993.

### B.     Disappearance of Nicholson, DeGeus, and the Duncan Family

Honken was released on bond. During June and July 1993, Honken and Johnson searched for Nicholson, often asking Johnson's friend, Christi Gaubatz (Gaubatz), to babysit Johnson's daughter while they searched. On July 7, 1993, Johnson purchased a .9 mm handgun.

Meanwhile, in mid-July 1993, a mutual friend introduced Nicholson to Lori Duncan (Duncan). Duncan was a single, working mother raising her two girls, Kandi (age 10) and Amber (age 6). Nicholson began staying at Duncan's house.

On the night of July 24, 1993, Honken and Johnson again asked Gaubatz to babysit Johnson's daughter and borrowed Gaubatz's car so they could search for

Nicholson. Honken and Johnson normally returned about midnight, but on this occasion they did not come home until around five o'clock in the morning. On July 25, 1993, Nicholson, Duncan, Kandi, and Amber suddenly disappeared.

Five days later, on July 30, 1993, Honken appeared for his plea hearing, but declined to plead guilty. Honken told his attorney he heard a rumor Nicholson had skipped town. Honken also provided his attorney with a VHS tape of Nicholson saying Honken was not guilty of the charges against him.

Around August 2, 1993, the government learned Nicholson was missing after warrants were issued for Nicholson's arrest and officers were unsuccessful in locating Nicholson. The government continued its drug investigation against Honken, now turning its attention to Honken's only other dealer, DeGeus. Honken told Cutkomp he was worried about DeGeus testifying against him. Honken believed DeGeus had been subpoenaed to appear before the grand jury.

DeGeus disappeared on November 5, 1993. The night of his disappearance, DeGeus dropped his 10-year-old daughter off at his mother's house and told his mother he was going to meet Johnson, his former girlfriend. DeGeus said he would return shortly to pick up his daughter that evening, but DeGeus never returned.

In the winter of 1993-1994, while cleaning a bedroom closet, Gaubatz discovered a large black handgun with attached silencer in a cosmetics bag belonging to Johnson. Gaubatz called Johnson to demand Johnson remove the gun. Johnson told Gaubatz not to worry about the gun because Honken would take care of it. That winter, Honken went to Cutkomp for assistance destroying a large black pistol. Honken and Cutkomp used a torch to cut and melt the gun into a number of unrecognizable pieces, which they discarded in ditches along a country road.

**C.  1996 Drug Charges, Threats Against Witnesses, and Escape Attempt**

While the 1993 charges against him were pending, Honken continued his methamphetamine manufacturing efforts. Honken built a complex methamphetamine laboratory and took significant steps toward manufacturing methamphetamine. Because Nicholson and DeGeus could not be found, the court dismissed the 1993 charges against Honken for lack of prosecution.

In the fall of 1995, Honken recruited Dan Cobeen (Cobeen) to help him manufacture methamphetamine. Unbeknownst to Honken, Cobeen went to police and began cooperating. With Cobeen's assistance, police began an undercover investigation, and on February 7, 1996, officers executed a search warrant at Honken's house. Officers seized a methamphetamine laboratory, chemicals, and equipment, as well as paper notes and books on manufacturing drugs and how to bind and gag prisoners. Honken was charged with, *inter alia*, conspiracy to manufacture methamphetamine from 1992 through February 7, 1996, in violation of 21 U.S.C. §§846, 841(a)(1) and 841(b)(1)(A).

While the 1996 charges were pending, Honken plotted to murder Cobeen, and certain police officers and chemists, and to destroy evidence against him. At this point, Cutkomp decided to cooperate with police. Cutkomp wore a wire and recorded numerous hours of conversations in which Honken referenced eliminating witnesses in 1993, and described his plan to evade the current charges by killing witnesses and officers. Based upon these tapes, the court revoked Honken's pretrial release and detained him in the Woodbury County Jail in Sioux City, Iowa. While incarcerated, Honken admitted to other inmates he killed witnesses to avoid earlier charges. Honken went into great detail about the murders. Honken also began planning the murders of Cobeen and Cutkomp, instructing a fellow inmate to kill Cutkomp and providing directions to Cutkomp's house. Together with another inmate, Honken attempted to escape by breaking a hole in the wall of a cell and arranging for Johnson to deliver a hacksaw and rope. Jailers discovered the hole and foiled the escape plot.

On June 2, 1997, Honken pled guilty to the drug charges and was ultimately sentenced to 324 months in prison.

### D. Johnson's Maps

In 2000, Gaubatz decided to cooperate in the ongoing murder investigation, telling officers about Honken's and Johnson's search for Nicholson, and about Gaubatz's later discovery of the gun in her closet. A federal grand jury indicted Johnson in July 2000, charging her with the murders of Nicholson, the Duncan family, and DeGeus.

At trial Honken stipulated, while in the Benton County Jail, Johnson became acquainted with Robert McNeese (McNeese), a federal prisoner serving a life sentence for an unrelated offense. Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson she could escape responsibility for the murders if McNeese could arrange to have another inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims. McNeese told Johnson that in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies. Johnson prepared and provided McNeese with maps and notes describing the locations where the five bodies were buried. McNeese turned the maps and notes over to law enforcement.

Using the maps Johnson drew, officers discovered the bodies of Nicholson and the Duncan family, buried in a single hole located in a wooded area outside Mason City. Kandi and Amber each had a single bullet hole in the back of their heads. Nicholson and Duncan were bound, gagged, and shot multiple times, including once in the head. DeGeus's body was found in a field a few miles away, face down in a shallow hole. DeGeus had been shot one or more times, and his skull was severely fragmented, requiring significant reconstruction.

## E.    Honken's Continuing Threats and Escape Plots

Honken was sent to the United States Penitentiary at Florence, Colorado, where he became convinced he would be charged with the murders. If tried for the murders, Honken planned to call his associates as witnesses in Sioux City, and then overpower and kill the guards and escape. After escaping, Honken intended to murder witnesses, law enforcement officers, and a federal prosecutor. To prepare for their escape, Honken and his associates practiced retrieving an officer's weapon, learning how to remove handcuffs with minimal tools, and training in martial arts scenarios centering around encounters with an armed escort.

## F.    Honken's Trial

Honken was charged with the murders on August 30, 2001, and his trial began in August 2004. Concluding Honken posed a serious security risk due to his prior escape attempts and threats against witnesses and officials connected with his trial, the district court ordered Honken to wear a stun belt and be shackled and bolted to the floor during his trial. To minimize potential prejudice to Honken, the district court ordered that Honken not be moved in the presence of the jury, that table skirts be placed on counsel tables so jurors would not see the shackles, that the shackles be fitted with sufficient chain to allow Honken to move naturally, and that the shackles make no noticeable noise.

The government presented fifty-four witnesses, over 300 exhibits, and thirteen days of trial testimony. On October 14, 2004, the jury found Honken guilty of all 17 counts.[7]

Shortly after penalty phase deliberations began on October 21, 2004, the jurors informed the court they were ending their deliberations early that day and they would

---

[7]Johnson was tried separately. This court affirmed Johnson's conviction and death sentence, but remanded to vacate Johnson's multiplicitous convictions and sentence. See United States v. Johnson, 495 F.3d 951, 982 (8th Cir. 2007).

not be deliberating the following day. Before leaving the building, Juror 523 asked a court employee for an excuse from work for the remainder of that day and the following day, because "her boss had been making inappropriate comments to her about the trial." The district court immediately investigated the allegation, questioning Juror 523 that same day. Juror 523 informed the court her boss had made comments as he walked by her desk such as "guilty, guilty, guilty," and "when are you gonna burn him[?]" At no time did juror 523 respond to any of her boss's comments. Juror 523 also told the court she had the impression, before she was picked for the jury, that the company hierarchy wanted her to get out of jury service, because her boss told her she "should have stood up in court and said hang him."

The court questioned Juror 523 further the next day, focusing on what she may have said to other jurors about her boss's comments. Juror 523 stated she had voiced her concerns about the jury's decision not to deliberate that day, saying she wanted to get her life back and explaining how hard it was for her to switch gears and go back to work. She acknowledged telling some other jurors her boss had said, "guilty, guilty, guilty." At the conclusion of the questioning, the parties and the court agreed to remove Juror 523 from further deliberations.

Next, the court instructed the other jurors not to continue their deliberations and began questioning each juror individually. One juror claimed to have no knowledge of Juror 523's boss's comments. Eight of the other ten jurors could not remember what the boss supposedly said, although five indicated they thought Juror 523's boss had been giving her a hard time about serving on the jury, rather than commenting about what the outcome of the trial should be. One juror stated Juror 523 indicated her boss made "remarks such as 'fry him' and stuff," and another juror stated Juror 523 indicated her boss made comments like "hang him," or "guilty, guilty, guilty" as he walked by her desk. Every juror who was aware of Juror 523's boss's purported comments testified that nothing about the comments affected his or her ability to be fair and impartial.

-8-

After questioning the jurors, the district court denied Honken's motion for a mistrial, giving Honken the option of proceeding with eleven jurors or replacing Juror 523 with an alternate. Without waiving his objections, Honken chose to proceed with an alternate, requesting Alternate Juror 425, who had professed no knowledge of Juror 523's boss's purported remarks. The court replaced Juror 523 with Alternate Juror 425, giving supplemental explanatory instructions and directing the reconstituted jury to begin penalty phase deliberations anew.

The jury returned its penalty phase verdict on October 27, 2004, voting to impose the death penalty for Kandi's and Amber's murders, and life imprisonment for the Nicholson, Duncan, and DeGeus murders.

### G. Post-Trial Hearing

In December 2004, the district court held a post-trial evidentiary hearing to further investigate Juror 523's boss's purported comments. The court and the parties extensively questioned Juror 523, her boss, and a number of other co-workers who may have had knowledge of the boss's purported comments. Ultimately, the district court determined Juror 523's testimony was inconsistent, and the only comment supported by credible testimony was "Juror 523 should have said something 'outrageous' to get out of jury duty." The court was unable to pinpoint precisely what "outrageous" comment Juror 523's boss suggested she make to get out of jury service, noting "[t]he nominees appear to be 'guilty, guilty, guilty,' . . . 'hang him,' . . . or 'I'm an expert in the law, enjoy the law, he's guilty or something of that nature,' which [was the boss's] description of his 'humorous' suggestion." Regardless of the precise content of the comment, the court determined it was made, and taken, in jest, after Juror 523 was selected for the "qualified" pool, but before Juror 523 was actually seated on the jury. The court found the boss's denial of ever making comments such as "guilty, guilty, guilty" and "fry him" to be credible. The court also found credible the boss's testimony he "did not know what trial Juror 523 was hearing; did not follow the Honken trial; did not know what the trial was about, apart from 'drugs'; did not

know that the case was a death penalty case, until after the trial was in progress; and that he did not pay attention to the process."

Finally, the district court concluded Juror 523 "was not troubled and upset by the comments that her boss was purportedly making, but by the stress of the duties of a juror in a capital case, coupled with the stress of changing 'gears' to return to work when she was not in trial, and the fact that she had to go to work while other jurors did not, all of which manifested in a desire to finish deliberations as quickly as possible and to 'get her life back.'" When questioned about the effect of her boss's comments, Juror 523 stated she ignored all the comments and the comments had no effect on her decision in Honken's case.

## II.    DISCUSSION
We separately address each of Honken's eleven assignments of error.

### A.    Double Jeopardy
#### 1.    Multiplicitous Counts
Honken argues his convictions for drug conspiracy murders (Counts 8 through 12) should be vacated as multiplicitous because those convictions are lesser included offenses of his convictions for CCE murders (Counts 13 through 17). The drug conspiracy murders and the CCE murders were both charged under 21 U.S.C. § 848(e)(1)(A). In the case of Honken's co-defendant, Johnson, we agreed her convictions for drug conspiracy murders and her convictions for CCE murders were multiplicitous, and we remanded so the district court could vacate her drug conspiracy murder convictions. See United States v. Johnson, 495 F.3d 951, 980-81 (8th Cir. 2007). In concluding Johnson's convictions were multiplicitous, we relied upon the Supreme Court's decision in Rutledge v. United States, 517 U.S. 292 (1996). Rutledge held, "because a drug conspiracy violation of 21 U.S.C. § 846 is a lesser included offense of a CCE violation of 21 U.S.C. § 848, a defendant may not be convicted of both offenses." Johnson, 495 F.3d at 980 (citing Rutledge, 517 U.S. at

306-07); see also United States v. Moore, 149 F.3d 773, 779 (8th Cir. 1998) (explaining a defendant could not be convicted of both conspiracy murder and CCE murder, but the district court could submit the two counts together and instruct jurors "if they found a defendant guilty of murder in furtherance of a CCE, they need not consider the charge of murder while engaged in a [drug] conspiracy").

The government agrees Honken's drug conspiracy murder and CCE murder convictions were multiplicitous, but argues, unlike Johnson, Honken waived his right to challenge the multiplicitous counts because he did not raise the multiplicity issue below. In support of its argument, the government cites United States v. Brown, 287 F.3d 684, 688 (8th Cir. 2002) (declining to reach the defendant's multiplicity argument because the defendant "failed to challenge the indictment on the ground that it was multiplicitous at any time before the district court" (citations omitted)) and United States v. Shephard, 4 F.3d 647, 650 (8th Cir. 1993) ("Federal Rule of Criminal Procedure 12(b)(2) requires that a complaint about the multiplicity of an indictment and its inherent double-jeopardy problems be raised before trial." (citation omitted)). See also United States v. Waller, 218 F.3d 856, 857 (8th Cir. 2000) (declining to consider the defendant's multiplicity issue where the defendant did not make the multiplicity argument to the district court). Honken replies, he "vigorously litigated the applicability of principles of double jeopardy to all ten capital counts," "the district court was alerted to the need for a double jeopardy analysis," and the district court erroneously decided the multiplicity issue in the Johnson companion case. Honken does not claim he specifically raised the multiplicity issue below, nor does Hoken direct our attention to a page in the voluminous record where he allegedly did so. We now decline to address the multiplicity argument because it was waived.

## 2. Successive Prosecutions

Honken argues his 1996 conviction for conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. § 846, barred his subsequent prosecution and convictions in 2004 for murdering five people in furtherance of a drug conspiracy and a CCE, in violation of 21 U.S.C. § 848(e)(1)(A). Honken claims the drug conspiracy for which he was convicted in 1996 is the same drug conspiracy underlying his convictions for CCE murders and drug conspiracy murders. The district court determined Honken's double jeopardy rights were not violated. See United States v. Honken, 271 F. Supp. 2d 1097, 1118 (N.D. Iowa 2003). We review de novo the district court's double jeopardy determination. See United States v. Mitchell, 476 F.3d 539, 544 (8th Cir. 2007) (citation omitted).

"The Double Jeopardy Clause of the Fifth Amendment declares: '[N]or shall any person be subject for the same offence to be twice put in jeopardy of life and limb. . . .'" United States v. Bennett, 44 F.3d 1364, 1368 (8th Cir. 1995) (quoting U.S. Const. amend. V). "Under this clause, a defendant is protected from both successive prosecutions and multiple punishments for the same criminal offense." Id. (citing United States v. Dixon, 509 U.S. 688, 704 (1993), and North Carolina v. Pearce, 395 U.S. 711, 717 (1969)).

Our disposition of Honken's double jeopardy claim is governed by the Supreme Court's analysis in Garrett v. United States, 471 U.S. 773 (1985). In Garrett, the Court held a CCE prosecution under 21 U.S.C. § 848, after an earlier prosecution for marijuana importation, did not violate the double jeopardy clause because the CCE offense was not the "same" offense as its predicate offenses within the meaning of the double jeopardy clause. Id. at 793. The Court explained, "[w]here the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature—in this case Congress—intended that each violation be a separate offense." Id. at 778. The Court thoroughly examined the "language, structure, and legislative history" of 21 U.S.C. § 848, concluding the

-12-

statute "show[ed] in the plainest way that Congress intended the CCE provision to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses."[8] Id. at 779.

In Honken's case, the plain language of 21 U.S.C. § 848(e) leads to the same conclusion—Congress intended to define both conspiracy murder and CCE murder, in violation of 21 U.S.C. § 848(e), as separate offenses from underlying drug conspiracy offenses in violation of 21 U.S.C. § 846. Section 848(e) provides, in pertinent part:

> **(1)** In addition to the other penalties set forth in this section—
> **(A)** any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title[9] . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, . . . may be sentenced to death[.]

21 U.S.C. § 848(e). The plain text of 21 U.S.C. § 848(e) states the § 848(e) punishment is authorized "in addition to other penalties set forth in this section." Thus, Congress expressly authorized separate punishments for drug conspiracy offenses punishable under 21 U.S.C. 841(b)(1)(A) and for conspiracy murders or CCE murders under 21 U.S.C. § 848(e). Nothing in the statute suggests Congress intended to preclude those multiple punishments from being imposed by way of successive prosecutions. Cf. Bennett, 44 F.3d at 1373 (noting the "distinction [between multiple

---

[8]The Garrett Court restated, in determining Congress's intent, the rule of statutory construction announced in Blockburger v. United States, 284 U.S. 299 (1932), "is not controlling when the legislative intent is clear from the face of the statute or the legislative history." Id. at 779 (citations omitted).

[9]A drug conspiracy in violation of 21 U.S.C. § 846 is "an offense punishable under section 841(b)(1)(A) of this title."

-13-

punishment and successive prosecution] is irrelevant for purposes of determining congressional intent," and concluding "nothing in [the statutory scheme at issue] would suggest that Congress intended to preclude separate convictions, regardless of whether separate convictions result from simultaneous or successive prosecutions." (internal quotation omitted)).

In addition, numerous other circuits have found Congress clearly intended murders under 21 U.S.C. § 848(e) to constitute separate offenses from predicate drug conspiracies punishable under 21 U.S.C. § 841(b)(1)(A). See United States v. Collazo-Aponte, 216 F.3d 163, 200 (1st Cir. 2000) ("Congress intended to permit a defendant to be convicted and sentenced separately for murder under [21 U.S.C. §] 848(e)(1) and a predicate drug conspiracy punishable under 21 U.S.C. § 841(b)(1)(A)"), *cert. granted in part, judgment vacated and remanded on other grounds*, 532 U.S. 1036 (2001), *on remand*, 281 F.3d 320 (1st Cir. 2002); United States v. McCullah, 76 F.3d 1087, 1104-05 (10th Cir. 1996) ("Congress has clearly expressed its intention that the § 848(e) punishment be cumulative with any other applicable punishment"); United States v. Snow, 48 F.3d 198, 200 (6th Cir. 1995) (examining the text of § 848(e) and concluding § 848(e) stated a substantive violation separate from § 846); United States v. Villarreal, 963 F.2d 725, 728 (5th Cir. 1992) ("We are convinced that Congress created a substantive offense in 21 U.S.C. § 848(e)(1)(B) and that its 'language, structure, and . . . history . . . show in the plainest way that Congress intended [it] to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses.'" (quoting Garrett, 471 U.S. at 779)). We agree with our sister circuits, Congress clearly intended to define both conspiracy murder and CCE murder, in violation of 21 U.S.C. § 848(e), as separate offenses from underlying drug conspiracy offenses in violation of 21 U.S.C. § 846.

In successive prosecution cases, determination of Congress's intent to define separate offenses does not end the double jeopardy analysis.[10] In Garrett, after determining Congress intended to define separate offenses, the Court explained the next step in the analysis is to "determine whether prosecution for a CCE offense after an earlier prosecution for a predicate offense is constitutional under the Double Jeopardy Clause of the Fifth Amendment." Garrett, 471 U.S. at 786. "The critical inquiry [in Garrett] [wa]s whether a CCE offense is considered the 'same offense' as one or more of its predicate offenses within the meaning of the Double Jeopardy Clause." Id. Courts typically apply the Blockburger "same elements" test to determine whether two crimes are the "same offense." See, e.g., Bennett, 44 F.3d at 1373 (citing cases). The Blockburger "same elements" test requires, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Blockburger, 284 U.S. at 304.

The Court in Garrett did not engage in a strict "same elements" analysis. Instead, the Garrett Court framed the inquiry somewhat differently. The Court began with the observation that, "[q]uite obviously the CCE offense is not, in any

[10]Had Honken been convicted of drug conspiracy, drug conspiracy murders, and CCE murders in a single trial, then our determination Congress intended multiple punishments would end the double jeopardy analysis. This is because, in the context of a single trial, "imposition of multiple punishments for the same underlying circumstances does not violate the Constitution as long as Congress intended it." United States v. Allen, 247 F.3d 741, 767 (8th Cir. 2001) (citing Albernaz v. United States, 450 U.S. 333, 344 (1981)), *judgment vacated on other grounds*, 536 U.S. 953 (2002), *on remand*, 357 F.3d 745 (8th Cir. 2004), *rehearing en banc granted, judgment vacated*, 357 F.3d 745 (8th Cir. 2004), *on rehearing en banc*, 406 F.3d 940 (8th Cir. 2005)). "In a single trial where separate and consecutive sentences are imposed for the same underlying circumstances, the Double Jeopardy Clause does no more than prevent a sentencing court from prescribing greater punishment than a legislature intended." Id. (citing Missouri v. Hunter, 459 U.S. 359, 368-69 (1983)).

commonsense or literal meaning of the term, the 'same' offense as one of the predicate offenses." Garrett, 471 U.S. at 786. The Court then recognized the CCE offense required the jury to make a number of findings in addition to those required for the predicate offense. Id.[11] Next, the Court "examine[d] not only the statute which Congress has enacted, but also the charges which form the basis of the Government's prosecution here." Id. Comparing the two sets of charges, the Garrett Court distinguished Brown v. Ohio, 432 U.S. 161 (1977). Garrett, 471 U.S. at 787-88. In Brown, the Supreme Court "held that, where the misdemeanor of joyriding was a lesser included offense in the felony of auto theft, a prosecution for the misdemeanor barred a second prosecution for the felony." Garrett, 471 U.S. at 787. The Garrett Court reasoned that in Brown, where the defendant stole an automobile and drove it for a few days, driving the stolen car was "a single course of conduct . . . [which] would support a misdemeanor prosecution for joyriding or a felony prosecution for auto theft," concluding "[e]very moment of [the Brown defendant's] conduct was as relevant to the joyriding charge as it was to the auto theft charge." Id. at 787. The Garrett Court decided the conduct at issue was "quite different," because it "[did] not lend itself to the simple analogy of a single course of conduct" typically involved when a defendant is prosecuted for both a greater and lesser included offense. Id. at 788.

The reasoning in Garrett applies with equal force in Honken's case. As the district court appropriately noted, "it is perhaps even *more* obvious here than it was in Garrett that conspiracy murder [and CCE murder] '[are] not, in any commonsense or literal meaning of the term, the "same" offense' as a drug conspiracy." Honken, 271 F. Supp. 2d at 1115, 1117 (N.D. Iowa 2003) (quoting Garrett, 471 U.S. at 786). Like the CCE charge in Garrett, both the drug conspiracy murders and the CCE murders in Honken's case require the government to prove a number of elements in

---

[11]The Garrett Court did not consider whether the predicate offense also required proof of a fact which the CCE offense did not, as considered under a traditional Blockburger "same elements" analysis.

-16-

addition to the elements required to prove the underlying drug conspiracy offense. Significantly, Honken's drug conspiracy murder and CCE murder convictions also punish a collateral course of conduct to the conduct at issue in Honken's drug conspiracy conviction.

"To establish a drug conspiracy, the government must prove the existence of an agreement between two or more persons to violate federal narcotics law, the defendant's knowledge of the agreement, and the defendant's voluntary participation in the agreement." United States v. Cordova, 157 F.3d 587, 592 (8th Cir. 1998) (citations omitted). To convict a defendant of drug conspiracy murder under 21 U.S.C. § 848(e)(1)(A), the government must prove (1) the defendant is guilty of the underlying drug conspiracy charged in the indictment; (2) the drug conspiracy involved at least the quantity of drugs triggering punishment under 21 U.S.C. § 841(b)(1)(A); (3) while engaging in the drug conspiracy involving the specified quantity of drugs, the defendant either intentionally killed or counseled, demanded, induced, procured, or caused the intentional killing of the victim; and (4) the killing of the victim actually resulted from the defendant's actions. See United States v. Walker, 142 F.3d 103, 113 (2d Cir. 1998). Thus, while the drug conspiracy murder charge requires proof the defendant committed the predicate offense of drug conspiracy, we are persuaded, as the district court was, that "'there is a good deal of difference between the classic relation of the "lesser included offense" to the greater offense presented in Brown, on the one hand, and the relationship between the' drug conspiracy and the conspiracy murder charges" in Honken's case. Honken, 271 F. Supp. 2d at 1116 (quoting Garrett, 471 U.S. at 787). The district court reasoned:

> Plainly, what is prohibited and punished by the statute defining a drug conspiracy offense is *an agreement to commit drug-trafficking offenses*, but what is prohibited and punished by the statute defining a drug conspiracy murder offense *is the murder*, albeit, a murder related to the drug-trafficking conspiracy. Thus, what the conspiracy murder offense punishes is a *collateral* "course of conduct" to the conduct at issue in the

drug conspiracy offense, and the "greater offense" does not involve a "single course of conduct" shared with the "lesser offense."

Id. We agree with the district court's well-reasoned conclusion, based upon Garrett, that drug conspiracy and drug conspiracy murder are different offenses for double jeopardy purposes.

This analysis also leads to the conclusion CCE murder is a different offense from the predicate drug conspiracy offense. To convict a defendant of CCE, the government must prove "1) a felony violation of the federal narcotics laws; 2) as part of a continuing series of violations; 3) in concert with five or more persons; 4) for whom the defendant is an organizer or supervisor; 5) from which he derives substantial income or resources." United States v. Maull, 806 F.2d 1340, 1342 (8th Cir. 1986) (citation omitted). To convict a defendant of CCE murder, "the government must prove (1) [the defendant] was engaged in or working in the furtherance of [a] CCE; (2) [the defendant] intentionally killed [the victim] or commanded, induced, procured or caused [the victim's] intentional killing; (3) that [the] killing actually resulted; and (4) that there was a substantive connection between the killing and the CCE." United States v. Jones, 101 F.3d 1263, 1267 (8th Cir. 1996). Thus, in addition to finding the defendant "violat[ed] [] the federal narcotics laws," the CCE offense requires the jury to make extensive additional findings relating to the CCE and the murder. Similar to the drug conspiracy murder offense, the CCE murder offense clearly punishes a "collateral course of conduct" (murder related to a CCE) to the conduct punished in the drug conspiracy offense. Honken's double jeopardy challenge to his CCE murder convictions fails.

We find particularly instructive the reasoning in Justice O'Connor's concurring opinion in Garrett. Justice O'Connor explained why she believed Garrett's "holding comports with the fundamental purpose of the double jeopardy clause and with the method of analysis used in our more recent decisions." Garrett, 471 U.S. at 795

-18-

(O'Connor, J., concurring). Justice O'Connor recited the central purpose of the Double Jeopardy Clause

> is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Id. at 795-96 (quoting Green v. United States, 355 U.S. 184, 187-88 (1957)). However, "the finality guaranteed by the Double Jeopardy Clause is not absolute, but instead must accommodate the societal interest in prosecuting and convicting those who violate the law." Id. at 796 (citing Tibbs v. Florida, 457 U.S. 31, 40 (1982) and United States v. Tateo, 377 U.S. 463, 466 (1964)).

Justice O'Connor explained, "successive prosecution on a greater offense may be permitted where justified by the public interest in law enforcement and the absence of prosecutorial overreaching." Garrett, 471 U.S. at 796. Justice O'Connor found support for this proposition in Diaz v. United States, 223 U.S. 442, 449 (1912), where the Court

> found no double jeopardy bar to a prosecution for murder where the victim of an assault died after the defendant's trial for assault and battery . . . impl[ying] that prosecution for a lesser offense does not prevent subsequent prosecution for a greater offense where the latter depends on facts occurring after the first trial.

Garrett, 471 U.S. at 796-97. Additionally, "[d]icta in Brown v. Ohio suggested that the same conclusion would apply where the later prosecution rests on facts that the government could not have discovered earlier through due diligence." Id. at 797 (citing Brown, 432 U.S. at 169 n.7). Such is manifestly the case here.

Honken's case is not a situation of prosecutorial overreaching or of the government using its greater resources and power in a repeated attempt to convict Honken, "thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Id. at 795-96. Instead, Honken's *own conduct* prevented his prosecutions from taking place at the same trial. The government did not prosecute Honken for CCE murders or drug conspiracy murders in 1996 when it prosecuted him for drug conspiracy because the government could not find the victims' bodies. Honken himself deliberately concealed the bodies by burying them in a remote wooded area. The fact Honken successfully concealed the victims' bodies for so many years does not operate to trigger the protections of the double jeopardy clause to bar Honken's convictions for murdering the victims. The government was entitled to prosecute Honken for the drug conspiracy offense in 1996, and was not precluded from continuing to develop evidence and later prosecute Honken for the victims' murders.

### B. Johnson's Maps

Honken contends the district court erred by admitting the maps drawn by Johnson which led investigators to the victims' bodies. Honken argues the maps (1) violated Honken's Sixth Amendment right to confront witnesses against him, (2) constituted inadmissible hearsay, and (3) had no probative value against him. The district court concluded the maps did not violate Honken's rights under the confrontation clause and ruled the maps were relevant and admissible as statements against penal interest under Federal Rule of Evidence 804(b)(3).

### 1. Confrontation Clause

"We review denials of confrontation clause objections de novo." United States v. Lee, 374 F.3d 637, 643 (8th Cir. 2004) (citation omitted). "If any evidence was admitted in violation of [Honken]'s confrontation rights, we consider whether the

error was harmless beyond a reasonable doubt." Id. at 643-44 (citing Lilly v. Virginia, 527 U.S. 116, 140 (1999)).

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Crawford v. Washington, 541 U.S. 36, 42 (2004) (quoting U.S. Const. amend. VI). In Crawford, "the Supreme Court held a witness's out-of-court statements that are testimonial in nature are barred under the Confrontation Clause, unless the witness is unavailable[12] and the defendant had a prior opportunity to cross-examine." Middleton v. Roper, 455 F.3d 838, 856 (8th Cir. 2006) (citing Crawford, 541 U.S. at 52-54), cert. denied, 127 S. Ct. 980 (2007). The Crawford Court defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (quotations and alterations omitted). However, the Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'" Id. at 68. The Court did provide some insight into what types of statements are "testimonial," explaining, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. The Court also noted, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51.

Using these principles to guide our analysis, we conclude Johnson's maps are non-testimonial. McNeese's attempt to trick Johnson into revealing the location of the bodies was not tantamount to a police interrogation. McNeese was acting as a government agent when he received the maps from Johnson. McNeese most likely anticipated Johnson's maps would be used at a later trial. However, we conclude the

---

[12]The parties agree Johnson was "unavailable" because she would have invoked her Fifth Amendment rights if called to testify at Honken's trial.

proper focus is on Johnson's expectations as the declarant, not on McNeese's expectations as the recipient of the information. Johnson did not draw the maps with the expectation they would be used against Honken at trial, nor did she draw the maps "for the purpose of establishing or proving some fact" against Honken. Johnson drew the maps for the express purpose of recruiting another inmate to confess to the murders so she and Honken could go free. Further, the maps obviously were not a "solemn declaration" or a "formal statement." Rather, Johnson more likely was "mak[ing] a casual remark to an acquaintance." We simply cannot conclude Johnson made a "testimonial" statement against Honken without the faintest notion she was doing so.

Even if the maps were "testimonial" and their admission violated Honken's confrontation rights, we conclude any error was harmless beyond a reasonable doubt.

> In assessing whether it appears beyond a reasonable doubt the complained-of error did not contribute to the verdict obtained, we consider the importance of the witness's testimony to the entire case, whether the testimony was cumulative, whether corroborating or contradicting evidence existed, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case against [Honken].

Middleton, 455 F.3d at 857 (citations omitted). The maps were unnecessary to the determination of Honken's guilt. Honken's convictions were not close ones—the government presented fifty-four witnesses, over 300 exhibits, and thirteen days of trial testimony. At trial, Gaubatz testified Honken and Johnson borrowed her car to look for Nicholson, did not return home until near dawn on the night Nicholson and the Duncan family disappeared, and stashed a gun in Gaubatz's closet. Cutkomp testified he helped Honken destroy a gun. Numerous inmates testified Honken admitted killing witnesses. The jury heard taped conversations where Honken referenced eliminating witnesses in 1993. The importance of the maps to the government's entire case was relatively minor. In light of the overwhelming evidence of Honken's guilt, we

-22-

conclude any violation of Honken's confrontation rights was harmless beyond a reasonable doubt.

Honken argues, under Ohio v. Roberts, 448 U.S. 56 (1980), Johnson's maps violated Honken's confrontation rights because they were insufficiently reliable. Honken's reliance on Roberts is misplaced. "Roberts conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" Crawford, 541 U.S. at 60. With respect to testimonial out-of-court statements, Crawford criticized the Roberts test as sometimes too broad and other times too narrow, barring the admission of such statements unless the witnesses are unavailable and the defendant had the opportunity for cross-examination. Id. at 52-54, 60-61. Honken argues the Roberts analysis still applies to non-testimonial hearsay. However, in Davis v. Washington, 547 U.S. 813, 821 (2006), the Supreme Court explained non-testimonial statements, "while subject to traditional limitations upon hearsay evidence, *[are] not subject to the Confrontation Clause*." (emphasis added). Honken provides no acceptable basis for analyzing the admission of Johnson's maps under Roberts.[13]

---

[13]Honken's reliance on Lilly is also misplaced. Lilly involved admission of a non-testifying accomplice's confession, in which the accomplice incriminated himself as well as the defendant. Using the analysis from Roberts, the Court in Lilly held the use of the accomplice's blame-spreading confession violated the defendant's confrontation rights because the confession was not within a firmly rooted hearsay exception. Lilly, 527 U.S. at 133-34. Lilly involved a confession (1) elicited during a police interrogation, and (2) that shifted responsibility for the crimes to the defendant. Id. at 120-21. Johnson's maps do not constitute a confession at all, much less a "testimonial" confession given during a custodial interrogation. Johnson's maps did not shift or spread blame to Honken. The maps themselves do not accuse Honken of anything.

## 2.    Statements Against Penal Interest

Having determined Johnson's maps do not implicate Honken's rights under the confrontation clause, we now address Honken's argument Johnson's maps were inadmissible as statements against penal interest.  Honken contends the maps do not constitute statements against Johnson's penal interest because she drew them in the hopes of aiding her penal interest.  "We review a district court's evidentiary rulings for abuse of discretion."  United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996) (citation omitted).

"Under [Federal] Rule [of Evidence] 804(b)(3), a statement is not excluded as hearsay if the declarant is unavailable as a witness and the statement was against the declarant's penal interest."  Id.  To be admissible as a statement against penal interest,

> a three-prong test must be satisfied: . . . (1) the declarant [must be] unavailable as a witness, (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement.

Id. (quotations omitted).

The first prong is satisfied because Johnson was unavailable to testify at Honken's trial due to Johnson invoking her Fifth Amendment right not to testify.  Johnson's maps clearly subjected her to criminal liability.  By admitting she knew where the victims' bodies were buried, Johnson implicated herself in the murders, or at least in the subsequent cover-up of the murders.  No reasonable person would make such a statement unless she believed it to be true.  The fact Johnson harbored the delusion that a complete stranger would take the blame for the five murders does not make the maps any less inculpatory.  Thus, the second prong is satisfied.  Finally, the third prong is satisfied because Johnson did not draw the maps to curry favor with

authorities or exonerate herself by shifting the blame to Honken. Instead, Johnson drew the maps in an attempt to have another inmate take the blame for the murders so she and Honken could go free. It was important for the maps to be accurate so the other inmate could credibly take the blame (of course, the maps ultimately led investigators to the victims' graves).

The maps satisfy any evidentiary standards of trustworthiness and reliability. We conclude the district court properly admitted Johnson's maps as statements against her penal interest.[14]

### 3. Relevance

Honken argues the district court erred by admitting the maps because they had no probative value against him. This argument need not detain us long. We concluded above, the maps were unnecessary to the jury's determination of Honken's guilt. However, the maps were relevant to issues in Honken's case. It is hard to imagine any murder trial where maps to the victims' bodies—no matter the drafter—would be irrelevant. In Honken's case, the government's theory was that Johnson and Honken acted together to kill witnesses against Honken. Johnson's

---

[14]At trial, the government conceded it had insufficient evidence to show the maps were non-hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy," so the district court did not admit the maps under Federal Rule of Evidence 801(d)(2)(e). To show a statement falls under Rule 801(d)(2)(e), "[t]he government must prove by a preponderance of the evidence that: 1) the conspiracy existed; 2) the defendant and the declarant were members of the conspiracy; and 3) the statement was in furtherance of the conspiracy." United States v. Sturdivant, 513 F.3d 795, 802 (8th Cir. 2008). Honken argues Johnson's maps were not drawn "in furtherance of the conspiracy" because there is no evidence the conspiracy between Honken and Johnson was ongoing in 2000. In our view, some evidence in the record, together with reasonable inferences, suggests the conspiracy was ongoing in 2000. Because the district court correctly admitted Johnson's maps as statements against her penal interest, we need not decide this issue.

knowledge of the location of the victims' bodies was probative against Honken, and not, as Honken suggests, impermissible evidence of guilt by association.

### C.    Courtroom Security Measures

Honken argues the district court abused its discretion by shackling Honken, bolting the shackles to the floor, and forcing him to wear a stun belt during trial. We review for abuse of discretion the district court's security decisions. See United States v. Mahasin, 442 F.3d 687, 691 (8th Cir. 2006). The district court must balance the need to maintain courtroom security against the possibility of prejudice to the defendant. See id.

#### 1.    Shackles

Shackling a defendant during trial causes two main constitutional concerns: (1) the shackles could impede the defendant's ability to participate in his defense, and (2) the shackles could suggest to the jury the defendant is guilty. See Hall v. Luebbers, 296 F.3d 685, 698 (8th Cir. 2002) (citations omitted). Like other security decisions, the district court's decision to shackle a defendant for security reasons is "accorded broad discretion." Id. at 699. After conducting an evidentiary hearing, the district court found a need to shackle Honken arising from Honken's prior escape attempts and his threats against witnesses, law enforcement officers, and prosecutors. See United States v. Honken, 378 F. Supp. 2d 1010, 1034 (N.D. Iowa 2004).

We could not agree more. As the district court recognized, we have concluded shackling is appropriate in similar situations. See Zeitvogel v. Delo, 84 F.3d 276, 283 (8th Cir. 1996) (deciding "[t]he trial court acted well within its discretion in deciding restraints were necessary to prevent [the defendant] from escaping and to protect others in the courtroom" where the defendant had been convicted of murder, rape, and assault, and had escaped from custody before); Hellum v. Warden, U.S. Penitentiary Leavenworth, 28 F.3d 903, 908-09 (8th Cir. 1994) (concluding shackling was appropriate in light of the defendant's determination, ingenuity, ability to overcome

normal security measures, and possible use of outside assistance in past escape attempts). Honken's potential for violence, history of escape attempts, and threats against witnesses and law enforcement is beyond serious dispute. Honken stood accused of murdering five people, including two young girls. The district court found ample evidence in the record from which to conclude Honken presented a serious escape risk and a threat to courtroom security—Honken plotted additional murders, including murdering officials in connection with his trial, and Honken planned various escape attempts, including training in martial arts, for the very purpose of escaping during his trial. These were compelling circumstances to shackle Honken at trial.[15]

The district court took a number of measures to ensure prejudice to Honken would be minimized, including directing "(1) that Honken not be moved in the presence of the jury; (2) that table skirts be placed on all counsel tables to prevent the jurors from seeing the shackles and bolt; [] (3) that the Marshal determine the best available means to prevent the shackles from making any noticeable noise during ordinary movements of the defendant while seated[;]" and (4) that the Marshal ensure the shackles be fitted with sufficient chain to allow Honken to stand naturally when required and to confer with his counsel. Honken, 378 F. Supp. 2d at 1035. These measures sufficiently minimized, if not completely eliminated, the danger of the shackles suggesting to the jury that Honken was guilty. Honken presented no evidence any member of the jury was ever aware Honken was shackled and bolted to the floor during trial. See Gilmore v. Armontrout, 861 F.2d 1061, 1071-72 (8th Cir. 1988) (where the district court took precautions to ensure the jury would not observe the defendant's restraints, "we have little difficulty concluding that the jury did not

---

[15]Honken makes much of the fact he had been well behaved and did not try to attack anyone at any of the court appearances leading to his trial. Our court has not adopted a "one bite rule" requiring a district court judge to wait until a defendant attempts to escape or attacks someone in the courtroom before ordering the defendant to be restrained.

-27-

observe anything so prejudicial as to pose an unacceptable threat to [the defendant's] right to a fair trial" (citation and internal quotation marks omitted)).

### 2. Stun Belt

Honken argues the use of a stun belt interfered with his right to communicate with counsel and participate in his own defense. In support of his argument, Honken cites an Eleventh Circuit case which explains, although stun belts are not visible to the jury and are therefore unlikely to interfere with the presumption of innocence, the constant "anxiety over the possible triggering of the belt" interferes with a defendant's ability to "follow the proceedings" and "participate fully in his defense." United States v. Durham, 287 F.3d 1297, 1306 (11th Cir. 2002). Honken also contends, because he was shackled and bolted to the floor, he "wasn't going anywhere," and the use of the stun belt constituted impermissible "piling on."

The district court agreed the "use of a stun belt should be subjected to close judicial scrutiny, because of its potentially disruptive effect on the defendant's rights and the fairness of the factfinding process." Honken, 378 F. Supp. 2d at 1037 (internal quotation marks and citations omitted). The district court then determined the "use of a stun belt is justified by the same essential governmental interests that justify use of shackles." Id. The district court also determined, given Honken's extreme dangerousness, that multiple restraints were justified in case one method failed, reasoning the use of shackles and a stun belt together "provides an appropriate level of mutually reinforcing deterrence and protection that is justified by the essential governmental interests in safety of the courtroom and prevention of escape and does so without additional prejudice." Id. at 1038. The district court explained using shackles and bolting the shackles to the floor "provides a reliable 'back-up' in the unlikely event" the stun belt would fail, while at the same time lessening the likelihood the stun belt would ever have to be discharged. Id. Considering Honken's dangerousness, martial arts training, and compelling desire to escape, we conclude the

-28-

district court did not abuse its reasoned discretion in ordering Honken to be shackled, bolted to the floor, and forced to wear a stun belt during trial.

### D.     Juror Substitution

Honken contends the district court erred by replacing Juror 523 with Alternate Juror 425 during penalty phase deliberations, arguing 21 U.S.C. § 848(i) did not allow such a substitution, and the district court's only available options were to declare a mistrial or empanel a new jury of 12 for the penalty phase deliberations.[16] Because the question of whether § 848(i) allows substitution of an alternate juror during penalty phase deliberations is one of law, our review is de novo. See, e.g, United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999) (standard of review).

Section 848(i) provides, in pertinent part:

**(i) Hearing before court or jury**

**(1)** When . . . the defendant is found guilty of . . . an offense under subsection (e) of this section, the judge . . . shall conduct a separate sentencing hearing to determine the punishment to be imposed.  The hearing shall be conducted—
> **(A)** before the jury which determined the defendant's guilt;
> **(B)** before a jury impaneled for the purpose of the hearing if— . . .

---

[16]The government contends Honken waived this argument because Honken chose to substitute an alternate rather than proceed with 11 jurors.  On the contrary, the record shows Honken asked for a mistrial, specifically arguing § 848(i) precluded juror substitution.  Only after the district court denied Honken's mistrial request and refused to empanel a new 12-member jury did Honken elect to substitute an alternate rather than proceed with 11 jurors, "subject to [Honken's] extensive and continuing and infinite objections."

> **(iii)** the jury which determined the defendant's guilt has been discharged for good cause;. . .
>
> **(2)** A jury impaneled under paragraph (1)(B) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate with the approval of the court that it shall consist of any number less than 12.

21 U.S.C. § 848(i).[17]

Honken claims the plain language of § 848(i) precludes substitution of an alternate during the penalty phase because the penalty phase jury must be the same "jury which determined the defendant's guilt." Honken argues the only alternatives allowable under § 848(i) were to declare a mistrial or discharge the whole jury for good cause, impaneling an entirely new jury to hear the penalty phase evidence and conduct penalty phase deliberations.

At least two sister circuits have addressed this issue. See Battle v. United States, 419 F.3d 1292, 1301-02 (11th Cir. 2005); United States v. Johnson, 223 F.3d 665, 669-71 (7th Cir. 2000).[18] Both the Seventh and Eleventh Circuits concluded the district court's substitution of an alternate for penalty phase deliberations did not

---

[17]In 2006, Congress repealed § 848's death penalty provisions (subsections (g) - (p)), "effectively rendering the [Federal Death Penalty Act, 18 U.S.C. §§ 3591-99] [the only statutory scheme] applicable to all federal death-eligible offenses." United States v. Barrett, 496 F.3d 1079, 1106 (10th Cir. 2007).

[18]The Johnson and Battle courts construed the language of the Federal Death Penalty Act, 18 U.S.C. § 3593(b)(1). Honken was prosecuted under the Anti-Drug Abuse Act (ADAA), 21 U.S.C. § 848. The relevant language in the two statutes is almost identical. Compare 18 U.S.C. § 3593(b) ("The hearing shall be conducted—(1) before the jury that determined the defendant's guilt . . .") and 21 U.S.C. § 848(i)(1) ("The hearing shall be conducted—(A) before the jury which determined the defendant's guilt . . . .").

violate the Federal Death Penalty Act (FDPA). See Battle, 419 F.2d at 1302; Johnson, 223 F.3d at 670. In Johnson, the Seventh Circuit reasoned:

> The statute makes no provision for the situation that occurred here [substituting an alternate for penalty phase deliberations], leaving it to the good sense of the judges to deal with. We find guidance to the proper resolution in the 1999 amendment to Rule 24 of the Federal Rules of Criminal Procedure, which, altering the previous practice [which required the court to discharge alternates when the jury retires to deliberate], allows the trial judge to replace a regular juror with an alternate *during* deliberations, which must then recommence. Fed. R. Crim. P. 24(c)(3). In other words, the fact that the alternate missed some of the deliberations is no longer regarded as a fatal objection, or indeed as any objection, to his participating in the jury's decision. The analogy to the procedure employed here is close.

Johnson, 223 F.3d at 670 (internal citation omitted). The Johnson court further explained, "the issues of guilt and punishment are sufficiently distinct that the alternate didn't have to hear the [guilt phase] deliberations . . . in order to be able to participate meaningfully in the [penalty phase] deliberations . . . . [The alternate] had sat through the entire trial, which is the important thing." Id. In Battle, the Eleventh Circuit agreed with the Seventh Circuit's reasoning in Johnson. Battle, 419 F.2d at 1302.

We are persuaded by the reasoning in Johnson and Battle. Like the FDPA, § 848(i) makes no specific provision for the substitution of an alternate during penalty phase deliberations. Instead of retrying this lengthy and complex capital case or re-presenting penalty phase evidence before a newly impaneled jury that had not heard guilt phase evidence, the district court chose the most reasonable solution available under the circumstances—replacing a juror with an alternate who sat through Honken's entire trial. The substitution took place shortly after penalty phase deliberations began. In further jury instructions, the district court emphasized the significance of beginning deliberations anew by providing new copies of the penalty

phase verdict form and specifically instructing the jury to "begin your discussions and deliberations concerning the penalty phase from the very beginning." Because § 848(i) provides no procedure for the situation that occurred here, we conclude it was not error for the district court to replace a juror with an alternate and instruct the jury to begin penalty phase deliberations anew.

### E. Alleged Jury Taint

Next, Honken asserts the district court violated his Sixth Amendment rights by upholding the guilty verdict despite dismissing Juror 523 during the penalty phase. Honken contends the guilty verdict should not be allowed to stand because the allegedly inappropriate comments by Juror 523's boss occurred before guilt phase deliberations. We review for abuse of discretion the district court's ruling on Honken's motion for a mistrial based on alleged jury taint. See United States v. Lussier, 423 F.3d 838, 841-42 (8th Cir. 2005) (citations omitted). A district court's determinations as to the credibility of witnesses are "virtually unreviewable on appeal." United States v. Ralph, 480 F.3d 888, 890 (8th Cir. 2007).

Honken claims there is no support for the district court's conclusion Juror 523 was upset by the stress of her duties as a juror, rather than by the comments Juror 523 attributed to her boss. The district court conducted a searching inquiry into the allegations of jury taint: questioning Juror 523 on two separate days, individually questioning each juror and each alternate, and conducting a post-trial evidentiary hearing where the court again questioned Juror 523, the boss who allegedly made the comments, and a number of Juror 523's co-workers who might have had knowledge of the purported comments. The trial judge found Juror 523's boss did not make comments to the effect of "guilty, guilty, guilty," "fry him," or "when are you gonna burn him?" Instead, the district court determined Juror 523's testimony was inconsistent, and the only comment supported by credible testimony was "Juror 523 should have said something 'outrageous' to get out of jury duty." The court also found credible the boss's testimony he "did not know what trial Juror 523 was

hearing; did not follow the Honken trial; did not know what the trial was about, apart from 'drugs'; did not know that the case was a death penalty case, until after the trial was in progress; and that he did not pay attention to the process." The district court then resolved Juror 523 "was not troubled and upset by the comments that her boss was purportedly making, but by the stress of the duties of a juror in a capital case, coupled with the stress of changing 'gears' to return to work when she was not in trial, and the fact that she had to go to work while other jurors did not, all of which manifested in a desire to finish deliberations as quickly as possible and to 'get her life back.'" Each of these determinations is supported by the record and was well within the district court's discretion.

Honken also disputes the district court's decision Honken suffered no prejudice as a result of Juror 523's participation in guilt phase deliberations. Honken claims he was prejudiced because the one comment the district court found—that Juror 523 should have said something "outrageous" to get out of jury service—occurred before guilt phase deliberations. Honken contends "prejudice is presumed" because Juror 523 was exposed to extraneous information from a third party. To support his argument, Honken relies on Remmer v. United States, 347 U.S. 227 (1954), where the Supreme Court held

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . [and] the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant.

Id. at 229 (citations omitted). In Remmer, a juror was offered money in exchange for a favorable verdict. Id. at 228-29.

We have consistently held the Remmer presumption of prejudice does not apply unless the alleged outside contact relates to factual evidence not developed at trial.

See, e.g., United States v. Rodriguez, 367 F.3d 1019, 1029 (8th Cir. 2004) (citing United States v. Hall, 85 F.3d 367, 371 (8th Cir. 1996)); United States v. Wallingford, 82 F.3d 278, 281 (8th Cir. 1996) (citing United States v. Blumeyer, 62 F.3d 1013, 1016 (8th Cir. 1995)). We also have concluded the Remmer presumption of prejudice applies in cases with facts like Remmer's—those involving outside communication or tampering. We explained, "[c]ontamination of a different kind occurs when, rather than being exposed to a fact not in evidence, a juror is subjected to psychological pressure by an outsider trying to coopt that juror's vote." United States v. Tucker, 137 F.3d 1016, 1032 (8th Cir. 1998). Juror 523's boss's remark that Juror 523 should have said something "outrageous" to get out of jury service does not involve improperly received facts or relate in any way to any issue in Honken's case. The comment could hardly be construed as an attempt to influence Juror 523's vote, particularly in light of the district court's conclusion Juror 523's boss "did not know what trial Juror 523 was hearing." The comment took place before Juror 523 was even seated on the jury. We therefore determine, as the district court did, that the comment amounted to nothing more than an unsolicited, passing remark which was made, and taken, in jest. Thus, the Remmer presumption of prejudice does not apply.

As we explained in Tucker, "whether the presumption shifts the burden of proof to the government or not, the ultimate question is the same: 'Did the intrusion affect the jury's deliberations and thereby its verdict?'" Id. at 1030 (quoting United States v. Olano, 507 U.S. 725, 739 (1993)). Even if we presume Honken was prejudiced by Juror 523's boss's suggestion to say something "outrageous" to get out of jury duty, our review of the record reveals any such presumption was soundly dispelled by the evidence adduced during the district court's various hearings on the issue. The evidence uniformly pointed to one conclusion—Juror 523's boss's comment was completely insignificant and the comment had no affect on the jury's deliberations or its verdict. Honken was not prejudiced by Juror 523's exposure to her boss's relatively insignificant comment.

Finally, Honken maintains, under Federal Rule of Evidence 606(b) (Rule 606(b)), the district court was prohibited from asking Juror 523 whether her boss's purported comments affected her ability to be fair and impartial. Rule 606(b) provides "a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, [and] (2) whether any outside influence was improperly brought to bear upon any juror," but

> may not testify as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith.*

Fed. R. Evid. 606(b) (emphasis added).

The circuits disagree whether Rule 606(b) prohibits a juror from testifying as to whether extraneous information or an outside influence affected the juror's ability to be impartial. A number of circuits addressing the issue have concluded such questioning is improper. See United States v. Greer, 285 F.3d 158, 173-74 (2d Cir. 2002) (noting, where the district court asked jurors in a post-verdict evidentiary hearing "whether the extra-record information impacted their ability to be fair and impartial . . . that line of questioning was improper" (citations omitted)); Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 917 (7th Cir. 1991) (stating, "[t]he proper procedure [to determine the existence of any unauthorized communication made to a juror] is for the judge to limit the questions asked the jurors to whether the communication was made and what it contained," and to make that determination "emphatically without asking them what role the communication played in their thoughts or discussion [or] whether there is a reasonable possibility that the communication altered their verdict" (citations omitted)); United States v. Simpson, 950 F.2d 1519, 1521 (10th Cir. 1991) (explaining a juror may "testify as to *whether*

any extraneous prejudicial information was improperly brought to bear upon a juror . . . [but] may not testify as to the *effect* the outside information had upon the juror").

By contrast, the Sixth Circuit found a district court abused its discretion by *not* asking jurors about whether their exposure to outside influences affected their ability to be impartial. See United States v. Herndon, 156 F.3d 629, 637 (6th Cir. 1998) (vacating a defendant's conviction and sentence, and remanding for a hearing so the defendant could "have an opportunity to prove actual bias," where the district court "not only failed to adequately investigate the allegation of juror partiality, but the juror never personally assured the court of his impartiality"); United States v. Walker, 1 F.3d 423, 431 (6th Cir. 1993) (remanding for a new trial where the judge "den[ied] the reasonable request to inquire into the jurors' states of mind" after jurors were exposed to unredacted deposition transcripts). The Ninth Circuit appears to agree with the Sixth. See United States v. Rutherford, 371 F.3d 634, 644 (9th Cir. 2004) (stating, "evidence regarding any influence that such improper conduct or contacts had on the jurors' abilities to fairly and impartially receive the evidence, listen to the testimony presented, and the judge's instructions is also admissible").

We have found no Eighth Circuit case specifically addressing whether a district court may, at a post-verdict hearing, ask a juror whether an outside influence affected that juror's ability to be impartial. However, we generally have observed Rule 606(b) "prevent[s] any examination into the effect . . . extrinsic material had on the mental processes of the jurors." United States v. Bassler, 651 F.2d 600, 603 (8th Cir. 1981). We now hold Rule 606(b) prohibits a juror from testifying at a post-verdict hearing as to whether extraneous information or an outside influence affected that juror's ability to be impartial. The plain language of Rule 606(b) permits a juror to testify as to "*whether* extraneous prejudicial information was improperly brought to the jury's attention [and] *whether* any outside influence was improperly brought to bear upon any juror" but the rule expressly prohibits a juror from testifying as "to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to

assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith." Fed. R. Evid. 606(b) (emphasis added). Asking a juror whether he or she believes extraneous information or an improper influence affected his or her ability to be impartial in reaching a verdict goes directly to "the effect of anything upon that . . . juror's mind or emotions," or "mental processes." We conclude it was improper for the district court to ask Juror 523 what effect her boss's comment had on her and whether exposure to the boss's comment affected her ability to be impartial.

This conclusion does not necessitate remanding Honken's case for a new trial. In Haugh, after finding the district court improperly questioned jurors, the Seventh Circuit reasoned:

> So there was error; what is to be done? One possibility would be to remand for a further hearing before the judge. But that would be futile because it would be unrealistic to expect him to erase the impression that the jurors' answers had made on him; nor is it irrelevant that the case is already a decade old. In the circumstances we think we should make our own judgment . . . .

Haugh, 949 F.2d at 919. Similarly, the Second Circuit in Greer made an "independent determination" as to whether the "outside contact . . . presented [any] information that could have been improperly used in deliberations," determining "a 'hypothetical average juror' would not have been influenced by the extrinsic information in this case." Greer, 285 F.3d at 174.

The circumstances of Honken's case also warrant an independent determination by this court. Because Rule 606(b) precludes questioning the jurors as to the subjective effects of an outside influence, "the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." Simpson, 950 F.2d at 1522 (citing Bassler, 651 F.2d at 603). "The inquiry is whether

there exists a reasonable possibility that the external influence or information affected the verdict." Id. (citation omitted). In Honken's case, no evidence suggests Juror 523's boss's remark, that Juror 523 should have said something "outrageous" to get out of jury service, presented even a remote possibility of influencing any typical or reasonable juror's verdict either in favor of or against Honken. The record does suggest the comment amounted to nothing more than an unsolicited, passing remark which was made, and taken, in jest. Honken is not entitled to a new trial.[19]

## F.    CCE Instruction

Honken protests the district court erred by failing to instruct the jury it had to find unanimously the identity of the five persons Honken directed as part of the CCE. See 21 U.S.C. § 848(c)(2)(A) (requiring a defendant to have acted "in concert with five or more other persons" whom the defendant organized, supervised, or managed). "Because [Honken] did not object to the instructions at trial, we review for plain error." United States v. Cuervo, 354 F.3d 969, 994 (8th Cir. 2004), *vacated on other grounds sub nom.*; Norman v. United States, 543 U.S. 1099 (2005), *aff'd on remand* 427 F.3d 537 (8th Cir. 2005). See United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc); Fed. R. Crim. P. 51(b) and 52(b).

In Cuervo, we held a district court's failure to give such a unanimity instruction under § 848(c)(2)(A)'s "five or more other persons" provision was not plain error.

---

[19]It is unclear whether Honken still contends, as he did below, that the entire jury was tainted because Juror 523 told some of the other jurors her boss said "guilty, guilty, guilty." The other jurors arguably could have been tainted by their exposure to these purported comments, even if the district court ultimately found only one passing remark was actually made. In his brief, Honken seems to abandon the contention the entire jury was tainted, focusing only on Juror 523's alleged taint. Juror 523's comments to some of the other jurors were her own concoction and not any actual outside influence. Our independent review of the record reveals there is no basis to conclude any jurors were tainted by their exposure to Juror 523's comments.

<u>Cuervo</u>, 354 F.3d at 995.  The district court did not plainly err by failing to give such an instruction in Honken's case.[20]

###### G.     Intent as an Eligibility Factor and an Aggravating Factor

Honken contends the district court erred in instructing the jury to weigh Honken's intent as an aggravating factor, when such intent was properly considered only as a threshold or "gateway" factor for death penalty eligibility.  Honken argues (1) the ADAA should set forth the same punishment scheme as the FDPA, which considers intent only as a "gateway" factor for death penalty eligibility; and (2) the ADAA is constitutionally infirm because the ADAA fails adequately to narrow the field of defendants who may receive the death penalty.

"We review the district court's jury instructions for abuse of discretion, [affirming] [i]f the instructions, taken as a whole, fairly and adequately submitted the issues to the jury[.]" <u>United States v. Lalley</u>, 257 F.3d 751, 755 (8th Cir. 2001). "We review federal constitutional questions de novo." <u>United States v. Bates</u>, 77 F.3d 1101, 1104 (8th Cir. 1996) (citation omitted).  "To withstand constitutional scrutiny, an aggravating factor which makes the defendant eligible for the death penalty must not apply to every defendant convicted of a murder, but instead only to a subclass of murder defendants, and it must not be unconstitutionally vague." <u>United States v. Paul</u>, 217 F.3d 989, 1001 (8th Cir. 2000) (citation omitted).

Title 21 U.S.C. § 848(k) provides:

The jury . . . shall return special findings identifying any aggravating factors set forth in subsection (n) of this section, found to exist.  If one of the aggravating factors set forth in subsection (n)(1) of this section

---

[20]Honken asks us to reconsider our decision in <u>Cuervo</u>.  "[T]his Court's precedent . . . prohibits any three-judge panel of the Court from overruling a previous panel opinion." <u>United States v. Wilson</u>, 315 F.3d 972, 973-74 (8th Cir. 2003).

and another of the aggravating factors set forth in paragraphs (2) through (12) of subsection (n)[21] of this section is found to exist, a special finding identifying any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section, may be returned . . . . If an aggravating factor set forth in subsection (n)(1) of this section is not found to exist or an aggravating factor set forth in subsection (n)(1) of this section is found to exist but no other aggravating factor set forth in subsection (n) of this section is found to exist, the court shall impose a sentence, other than death, authorized by law. If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury . . . shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.

21 U.S.C. § 848(k). Thus, "[the subsection (n)(1)] factors act as both a gateway and as aggravators. If the jury does not find at least one of these factors, its consideration of a penalty of death must stop; once the jury finds an (n)(1) factor, it must later weigh that factor (along with other aggravators) against any mitigating factors." United States v. Flores, 63 F.3d 1342, 1370 (5th Cir. 1995).

The district court's instructions followed the procedure set forth in 21 U.S.C. § 848(k). In Step One, Honken's jury was instructed to consider "eligibility aggravating factors," requiring a determination of whether Honken had the requisite criminal intent, as set forth in § 848(n)(1). In Honken's case, this determination required the jury to choose whether: (1) Honken intentionally killed the victims, or (2) Honken intentionally engaged in conduct intending the victims be killed. The jury

---

[21]Subsection (n)(1) describes different categories of a defendant's criminal intent and refers to intent factors as "aggravating factors." The remaining paragraphs of subsection (n) list additional aggravating factors.

unanimously determined Honken intentionally killed each of the victims. In Step Two, the jury determined the existence of "statutory aggravating factors," as set forth in § 848(n). The jury unanimously found at least one statutory aggravating factor applied to each of the victims. Step Three required the jury to determine the existence of "non-statutory aggravating factors." The jury found the existence of each non-statutory aggravating factor alleged. The jury was then instructed to determine the existence of any mitigating factors in Step Four. Finally, the jury was required to weigh the aggravating factors found in Steps One, Two, and Three, and the mitigating factors found in Step Four, to determine whether death was the appropriate punishment.

Honken asserts the "intent factors" set forth in § 848(n)(1) are not really aggravators at all, but merely pre-conditions to the consideration of the death sentence. To support his argument, Honken points out, under the FDPA, intent is considered to be a "gateway" finding only with no further weight given to intent when weighing of aggravating and mitigating factors takes place. Honken contends the doctrine of constitutional avoidance requires an interpretation of the ADAA consistent with the FDPA. Honken further claims the "intent factors" are constitutionally infirm because they apply to every defendant eligible for the death penalty, and do not narrow the universe of defendants eligible for the death penalty.

This court has not directly addressed whether it is constitutional for intent to be considered both in terms of eligibility and also as an aggravating factor. Several other circuits have squarely rejected Honken's argument. For example, in United States v. McCullah, the Tenth Circuit observed the "clear language" of the ADAA provides for intent to be considered both as an eligibility factor and as an aggravating factor. McCullah, 76 F.3d at 1108-09. The McCullah court reasoned:

> The fact that Congress changed the capital sentencing scheme for other crimes six years after the adoption of § 848(e) *et seq.* does not alter the

plain language interpretation of § 848(e). The [FDPA] created a new capital sentencing scheme for many federal offenses, but significantly did not alter § 848(e). Even had the [FDPA] been an amendment to § 848, it would merely indicate that Congress can, and did, alter the federal capital sentencing scheme for drug conspiracies. However, this does not in any way indicate any error in the prior scheme; there is more than one proper method of structuring a capital sentencing scheme.

Id. at 1109 (internal citations omitted).

The McCullah court also rejected Honken's claim § 848 fails adequately to narrow the class of defendants eligible for the death penalty, explaining,

Congress has statutorily narrowed the field of death eligible defendants by limiting the possibility of capital punishment to homicides in furtherance of continuing criminal enterprises or other specified offenses. Thus, contrary to [defendant]'s assertion, only a small subset of all potentially death-eligible defendants are subject to capital punishment under the federal scheme, and thus the requisite narrowing is present.

Id. (internal citation omitted). See also United States v. Tipton, 90 F.3d 861, 897-98 (4th Cir. 1996); Flores, 63 F.3d at 1370-71.

We agree with the reasoning of our sister circuits. The fact the FDPA and ADAA are similar in a number of respects does not support the conclusion the ADAA must provide exactly the same sentencing scheme and penalty phase procedure as the FDPA. Further, the ADAA indeed narrows the class of defendants eligible for the death penalty. We conclude the district court did not err in instructing the jury to weigh Honken's intent as both an eligibility factor and an aggravating factor.

### H.    Motion to Allocate

Honken contends the district court erred by denying his motion to give a statement to the jury without being cross examined. We have previously explained

-42-

defendants have neither a constitutional nor a statutory right to allocution before a jury. See United States v. Purkey, 428 F.3d 738, 761 (8th Cir. 2005) (citations omitted). "[Federal Rule of Criminal Procedure] 32(i)(4)(A)(ii) requires that '[b]efore imposing sentence,' the district court must 'permit the defendant to speak or present any information to mitigate the sentence.'" Id. We acknowledged in Purkey "[the defendant]'s allocution could not have mitigated his sentence because it followed the jury's recommendation of the death penalty." Id. Nevertheless, Rule 32 does not "grant [defendants] a right to allocution before a jury; Rule 32 speaks only of 'the court.'" Id. The district court did not err by denying Honken's motion to allocute before the jury.[22]

## I.    Closing Argument

Honken argues the prosecutor's penalty phase closing argument misled jurors and violated Honken's Eighth Amendment rights. Because Honken did not object to the government's closing argument, we review for plain error, "only revers[ing] under exceptional circumstances." United States v. Samples, 456 F.3d 875, 885-86 (8th Cir. 2006) (internal citations and quotation omitted); see Pirani, 406 F.3d at 550, 552.

Honken contends the government improperly minimized the jurors' sense of individual responsibility and encouraged the jurors to seek refuge in numbers when the prosecutor made the following argument:

> Finally, the defense says that you are 12 juries of 1. You are 1 jury of 12. In order to impose the death penalty in this case, it must be unanimous. Now, as a consequence of that, that decision does not rest on any one individual shoulder of this jury. Each of you individually told us that you could, in the appropriate case, sign a verdict form that

---

[22]Honken asks us to reconsider our decision in Purkey. As earlier discussed, "this Court's precedent . . . prohibits any three-judge panel of the Court from overruling a previous panel opinion." Wilson, 315 F.3d at 973-74.

would impose the death penalty on another person.  But to do that, you do that as a group.  And as a group there's strength.

This is not – the decision to impose the death penalty does not rest on any one individual shoulder.  It rests on this jury as a group.  And as a group, the United States asks you to go back and deliberate.  We know this is a hard decision.  We know these are the most serious of consequences.  But you know the facts of this case.  You know this defendant.  You know what he did.  And you know what he's capable of.  And you know what justice requires.  Thank you.

In the case of Honken's co-defendant, Johnson, we found an almost identical argument, by the same prosecutor, unobjectionable.  In Johnson's case, the prosecutor said, "And if you choose the death penalty, you choose it as a group.  It doesn't rest on the shoulders of any one of you . . . .  There's courage in numbers."  Johnson, 495 F.3d at 979.  We stated:

These comments were not improper.  While it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere, such as an appellate court, that was not what the prosecutor was doing here.  The prosecutor was instead reposing the responsibility upon the jury, where it belonged.

Id. (internal quotation omitted).

Honken reasons that, unlike the closing argument in Honken's case, the prosecutor in Johnson's case "tempered his comments by acknowledging the jurors' individual responsibility."  As in Johnson's case, the closing argument for Honken simply emphasized that unanimity is required and no individual is solely responsible for imposing the death penalty.  Earlier in his closing argument, the prosecutor expressly acknowledged each juror's individual responsibility for the verdict, saying,

> Many, many weeks ago when we started the jury selection process in this case . . . we asked you this question, each and every one of you. We said, [i]n the appropriate case, do you have the courage to sign your name to a piece of paper to impose the death penalty on another human being, and each of you said yes. This is the appropriate case, ladies and gentlemen.

The prosecutor's statements regarding the jury's role correctly stated the law and did not mislead the jury.

### J. Constitutionality of the Death Penalty

Honken urges this court to declare the death penalty unconstitutional because of the possibility innocent people may be executed. Honken himself does not claim to be one of those innocent people he fears may be wrongly executed. Instead, Honken makes a policy argument against the death penalty generally. Honken cites a district court decision from the Southern District of New York—later reversed by the Second Circuit—which held the FDPA unconstitutional. See United States v. Quinones, 205 F. Supp. 2d 256 (S.D.N.Y 2002), *rev'd*, 313 F.3d 49 (2d Cir. 2002). Reversing and holding the FDPA constitutional, the Second Circuit observed,

> the argument that innocent people may be executed—in small or large numbers—is not new; it has been central to the centuries-old debate over both the wisdom and the constitutionality of capital punishment, and binding precedents of the Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent.

Quinones, 313 F.3d at 63. "Since 1878, the Supreme Court has upheld challenges to death penalty statutes based upon the Due Process Clause as well as the Eighth Amendment." Id. at 65 (citing cases). Specifically, the Supreme Court in Furman v. Georgia, 408 U.S. 238 (1972), "was presented with, considered, and declined to adopt the argument that capital punishment unconstitutionally deprives innocent persons

who have been sentenced to death of the opportunity to exonerate themselves." Id. at 65-66.  Under our Constitution, the government explicitly may, with due process of law, deprive a person of life.  U.S. Const. amend. V.  Honken's argument is a policy matter for Congress.  We reject Honken's invitation to hold the death penalty unconstitutional based on the possibility innocent people may be executed.

### K.      Submission of Statutory Aggravating Factors to the Grand Jury

Honken argues the penalty provisions of the ADAA, 21 U.S.C. § 848(e) - (r), are unconstitutional after Ring v. Arizona, 536 U.S. 584 (2002), because the ADAA "grants authority to allege aggravating factors exclusively to the prosecutor, while the Constitution requires that such elements be presented to a grand jury and charged in an indictment."  In Ring, the Supreme Court held the Sixth Amendment does not "allow[] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty."  Ring, 536 U.S. at 609.  Instead, "the Sixth Amendment requires that [such aggravating factors] be found by a jury."  Id. Interpreting Ring, our court further extrapolated, although "Ring did not address whether the Fifth Amendment also requires capital aggravating factors to be found by the grand jury and included in the indictment . . . we think that Ring necessarily implies such a Fifth Amendment requirement."  United States v. Allen, 406 F.3d 940, 942 (8th Cir. 2005) (en banc).  Thus, "the Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment."  Id. at 943 (citations omitted).  Consistent with Ring and Allen, the government in Honken's case included the aggravating factors in a superseding indictment, and the grand jury returned a superseding indictment which included all the aggravating factors ultimately found by the petit jury.

Honken next charges the government was not permitted to "amend" the ADAA by submitting aggravating factors to the grand jury and including them in the indictment.  Honken contends, because the ADAA contemplates the government will file a separate notice of statutory aggravating factors, the government is thereby

prohibited from submitting the same aggravating factors to the grand jury, and such a prohibition is unconstitutional under <u>Ring</u>. In <u>Allen</u>, we rejected the precise contention Honken makes here, explaining:

> While it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, *nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment.* This is the practice that the Department of Justice has adopted after <u>Ring</u>, and it preserves the constitutionality of FDPA prosecutions.[23]

<u>Allen</u>, 406 F.3d at 949 (citations omitted) (emphasis added). In <u>Purkey</u>, we reaffirmed our holding in <u>Allen</u>. <u>Purkey</u>, 428 F.3d at 748-49. Like the FDPA, nothing in the ADAA inhibits the government's ability to submit aggravating factors to the grand jury for inclusion in the indictment. Therefore we reject Honken's argument the penalty provisions of the ADAA are unconstitutional.

## III.   CONCLUSION

As explained above, we affirm the district court's judgment in all respects.

————————————————————

---

[23]Although Honken was prosecuted under the ADAA and not the FDPA as in <u>Allen</u>, the notice provisions and logic are the same.